UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

Case No.  10-81070-CIV-DIMITROULEAS/Snow

TRUDY B. DI DOMENICO,

          Plaintiff,

      vs.

MICHAEL J. ASTRUE, Commissioner
of Social Security,

          Defendant.
_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on the plaintiff's complaint seeking judicial review of a final decision of the Social Security Administration denying the plaintiff's application for disability benefits.  The complaint was filed pursuant to the Social Security Act, 42 U.S.C. § 401, et. seq., and was referred to United States Magistrate Judge Lurana S. Snow for report and recommendation.

## I. PROCEDURAL HISTORY

The plaintiff filed an application for disability benefits on September 11, 2007, alleging disability since June 2, 2005, as a result of leukemia.  The application was denied initially and upon reconsideration.

The plaintiff then requested a hearing which was held before Administrative Law Judge Jennifer Millington on October 21, 2008.  The ALJ found that the plaintiff was not disabled within the

meaning of the Social Security Act.  The Appeals Council denied the plaintiff's request for review on July 15, 2010.  The plaintiff then filed this action seeking judicial review of the decision of the Commissioner.

## II. FACTS

The plaintiff was born on April 9, 1953, and was 56 years old at the time of her hearing.  She has a high school education and her past relevant work was as a teacher's assistant, a job she performed from 1997 until she ceased working in June 2005.  The plaintiff was insured for benefits through December 2006. (R: 32, 147, 155, 162, 165)

The medical record reflects that on September 18, 2000, the plaintiff presented to Barbara Turkell, D.C., for evaluation of pain in her neck and on the right side of her low back, radiating to the right buttock, as well as on the left side of her low back, radiating to the left hip.  The plaintiff walked with mild flexion and antalgic position, with a guarded gait.  The plaintiff reported that she had been injured in a car accident in November 1997. (R:389-90)

Dr. Turkell reviewed a cervical MRI which was performed on January 7, 1998.  It showed degenerative and hypertrophic spondylitic changes at C5-C6 and C6-C7, with disc herniations contributing to the extradural compression of the thecal sac; ventral impingement upon the cord at C5-C6; straightening of the normal cervical lordosis, and changes of diffuse cervical disc dessication/degeneration. A lumbar spinal MRI performed on the same date revealed slight grade I spondylolisthesis at L4-L5, mild

spondylitic change from the L3 through S1 levels, with bulging discs contributing to ventral impingement on the thecal sac; facet hypertrophy and ligamentum flavum prominence at the T4-T5 level, contributing to mild central canal stenosis, and neuroforaminal encroachment/narrowing at the L4-L5 and L5-S1 levels.  An addendum to the MRI reports which compared the 1998 scans with scans that had been performed in November 1987, which indicated that there had been advanced degenerative changes at the C5-C6 and C6-C7 levels. (R:391-92)

Dr. Turkell concluded that the plaintiff's injuries were prone to exacerbations and remissions.  It was difficult to determine how often such exacerbations would occur, since frequency would depend on physical activity, stress, muscle weakness and generalized lifestyle. (R:392)

At various times from February 2003 to April 2008, the plaintiff was treated by David Felker, M.D., for respiratory and digestive problems, back pain and facial swelling. (R:320-42)   On December 11, 2003, Dr. Felker noted that he had seen the plaintiff multiple times during the preceding few months, primarily for allergic reaction with facial swelling and sinusitis.  The plaintiff told Dr. Felker that she was "stressed out" because her daughter had dropped out of college.  The doctor opined that this stress was "probably the source of all her physical ailments." (R:325) The record reflects that plaintiff saw Dr. Felker four additional times: in November 2004, December 2004, May 2005 and April 2008. (R:320-24)

On December 28, 2003, a colonoscopy was performed on the plaintiff by Rodney S. Cohen, M.D.   Dr. Cohen noted that the plaintiff had a history of polyps, rectocarcinoid and proctitis/colitis.  He found no signs of polyps or other problems, and advised the plaintiff to follow-up for routine examination in two or three years. (R:355)  Biopsies performed during the procedure revealed only non-specific mild chronic inflammation, with no evidence of active ulcerative colitis, dysplasia or malignancy. (R:354) Dr. Cohen performed another colonoscopy in November 2006, again with normal results. (R:346)

On May 9, 2006, the plaintiff presented to Harold Richter, M.D., a hematologist.  Dr. Richter noted that the plaintiff had been diagnosed with B cell chronic lymphocytic leukemia, with the first evidence of leukocytosis in October 2003.  However, the plaintiff had remained asymptomatic except for occasional fatigue.  She had no fevers, chills, seats, nausea, vomiting, diarrhea, headaches or dizziness.  The plaintiff did have a history of sinusitis as well as ulcerative colitis. She also suffered from angioneurotic edema, for which she was taking Zyrtec and Axid.  Physical examination of the plaintiff, including musculoskeletal and neurologial examination, was normal except that lymph examination revealed small right sided cervical adenopathy.  Dr. Richter diagnosed B cell chronic lymphocytic leukemia, clinically and hematologically stable. He recommended an ear, nose and throat examination for use as a baseline, and follow-up in three months. (R:302)

On September 15, 2006, the plaintiff consulted with Allesandra Ferrajoli, M.D., another hematologist, for a second opinion on her recent diagnosis of chronic lymphocytic leukemia. Dr. Ferrajoli told the plaintiff that she appeared to have stage 0 chronic lymphocytic leukemia, with extremely slow doubling time and symptoms of increasing fatigue. Dr. Ferrajoli explained that female patients were showing excessive fatigue associated with early disease, which improved significantly after treatment with monoclonal antibodies. The doctor recommended an exercise program and investigation of the Mayo Clinic's use of green tea extract. (R:221-22)

The plaintiff had follow-up examinations by Dr. Richter approximately every three months from November 2006 until September 2008. Her chronic lymphocytic leukemia remained stable, with no symptoms other than fatigue. No treatment for the leukemia was required. She continued to take Zyrtec, Axid and Singulair for digestive and sinus problems. (R:254-58, 286-99)

In July 2007, the plaintiff complained of pain in her left thigh, which Dr. Richter believed to be arthritic and unrelated to the leukemia. (R:257) An MRI of the plaintiff's left thigh and left hip, performed on July 18, 2007, revealed no significant arthritis or labral degenerative changes; no joint effusion or synovitis; no evidence of muscle denervation or atrophy, and no significant muscle strain or hematoma. However, the MRI did show mild right L5-S1 foraminal narrowing secondary to bony spurring. (R:315-16)

The medical record documents two visits to Victor Goldbetter, M.D., an internist, on September 26, 2007, and on November 2, 2007.  Although Dr. Goldbetter's notes are difficult to decipher, it appears that the plaintiff presented to him complaining of pain, and that Dr. Goldbetter prescribed pain medication. (R:224-25)  Dr. Goldbetter ordered a carotid doppler duplex ultrasound and an echocardiogram, which were performed on September 26, 2007, and which yielded normal results. (R:311-12)

On July 19, 2008, Dr. Goldbetter completed a physical capacities evaluation of the plaintiff, in which he stated that the plaintiff had seen him on 16 occasions between July 13, 2007, and August 19, 2008.  He stated that the plaintiff displayed symptoms of chronic fatigue and back spasm, as well as facial swelling, which he attributed to chronic lymphocytic leukemia. Dr. Goldbetter also opined that the plaintiff's symptoms, complaints and related functional restrictions had been present since at least June 2, 2005. (R:304)

Dr. Goldbetter believed that the plaintiff could sit for 4 hours during an 8-hour workday and could stand and/or walk for 4 hours during that time period.  She could never lift anything, even objects weighing less than 5 pounds.  The plaintiff could grasp objects and perform fine manipulations for less than 4 hours during a workday; push/pull arm controls for less than an hour, and reach at or above the shoulder level for less than 5 hours on the right and less than 2 hours on the left.  The plaintiff could never bend, stoop, crouch, kneel, crawl or climb stairs and could never use her

feet for repetitive movements on a sustained basis. She required complete freedom to rest frequently and without restriction and it was necessary for her to lie down for substantial periods of time during the day. Additionally, the plaintiff's medications caused drowsiness, nausea, impaired concentration and irritability. (R:305-07)

The record also contains a letter from the plaintiff's pulmonologist, Samuel S. Jacobsen, M.D., dated October 8, 2008, which recites that Dr. Jacobsen had seen the plaintiff for recurrent infections over the preceding six months. The plaintiff required several courses of antibiotics as the result of chronic sinusitis. She also suffered from chronic lymphocytic leukemia, allergic rhinitis, some degree of asthma and angioedema. In Dr. Jacobsen's view, the plaintiff's degenerative disc disease and chronic low back pain made it very difficult for her to lift more than 5 pounds, sit for more than 1 hour or stand for more than 1-2 hours. Dr. Jacobsen believed that the plaintiff was totally and permanently disabled from any work exceeding these restrictions, and her condition was unlikely to improve. (R:344) The record does not contain any treatment records or notes from Dr. Jacobsen.

On November 10, 2008, an MRI of the plaintiff's cervical spine revealed degenerative disc disease with small central and left paracentral disc protrusion at C5-C6, but without cord compression; mild right foraminal stenosis; advanced degenerative disc disease with spondylitic spurring and borderline foraminal compromise at C6-C7, and 2-3 mm anterolisthesis, likely degenerative, at C3-4 and C4-

7

5.  (R:393-94) An MRI of the plaintiff's lumbar spine performed on the same date showed grade 1 spondylolisthesis  and mild to moderate degenerative disc disease at L4-5, with marked ligamentum flavum and facet degenerative hypertrophy impinging on the posteolateral thecal sac and contribution to moderate central canal stenosis; minimal annular bulging without disc herniation at L3-4, but with ligamentum flavum hypertrophy and facet osteoarthritis contributing to mild central canal stenosis and borderline compromise of the lateral recesses, and advanced degenerative disc disease with disc space narrowing and loss of disc signal at L5-S1, accompanied by mild facet degeneration and moderate ligamentum flavum hypertrophy, with borderline central stenosis.  Also at L5-S1, there was bilateral end plate spurring encroaching upon the inferior neural canals, producing moderate right and severe left foraminal stenosis. (R:395).

At her disability hearing, the plaintiff testified that the impairments which have kept her from working are daily fatigue, chronic back and neck pain, severe swelling in her face and chronic sinusitis.  She explained that at times her neck would lock up and she also had severe pain in her left hip.  The plaintiff was unable to take pain medication because it made her sick to her stomach, so she was required to lie in bed on ice.  The plaintiff also stated that she had lost feeling in her left index finger, probably as the result of nerve damage.  (R:33-35)

The plaintiff was not taking any medication for leukemia, but had been on medicine for angioedema for years, primarily Axid

and Zyrtec.  Sometime she needed to take cortisone for break though edema in her esophagus, and frequently she took antibiotics for sinus infections.  The plaintiff believed that the medications she took caused her to be very fatigued. (R:35-7)

The plaintiff's daily routine included trying to do a little housework, such as laundry.  Sometimes she went to the grocery store, which was near her home, but she was not able to drive long distances because of numbness in the buttocks area.  On returning from the store, the plaintiff would rest a bit and then try to prepare dinner.  She sometimes tried to walk, but most of the time she would get so tired she would have to return home.  (R:38-9)

The plaintiff lived with her husband and daughter, who together did most of the housework.  The plaintiff watched some TV, did some reading and attended synagogue, although she could not sit through an entire service.  She had relatives who came to visit her. The plaintiff had signed up for a yoga class, but was unable to make it through the first class.  (R:39-41)

The plaintiff did not quit her teacher assistant job, but was asked to leave because she was taking too much time off.  She testified that her symptoms have remained about the same since the time she stopped working.  She needed to take several rest periods during the day and had to change positions frequently.  The most comfortable position was lying on an ice pack, which she did two or three times per day for about twenty minutes each time. Because of her back problems, the plaintiff was unable to remove clothes from the dryer and had to move slowly and carefully to the bathroom.  She

was allergic to most pain medications and had to rely on Tylenol. (R:41-5)

The ALJ called as a medical expert (ME) Dr. John Griscom, a specialist in internal medicine. Dr. Griscom testified that initially, the plaintiff's major issue was chronic lymphatic leukemia, but noted this condition had remained at stage zero through the date of the hearing. The only symptom of the leukemia was fatigue, which the plaintiff began experiencing in 2005. From the medical record it appeared that the plaintiff's prognosis was very good for a long period of time in the future, and perhaps indefinitely. (R:48-50)

Regarding the plaintiff's other complaints, Dr. Griscom observed that there was not much information in the record. The treatment records did indicate that the plaintiff had suffered from angioedema for a long period of time, dating back to the 1990s. As to her back problems, Dr. Griscom noted that the MRI of the plaintiff's hip did show her lumbar spine as well. The MRI revealed a disc bulge with a spur and some neuroforminal narraowing at L5-S1, but there was no evidence of a ruptured disc or other major problem. Dr. Griscom acknowledged that it was difficult to ascertain how many of the lumbar vertebrae could be seen when the MRI of the plaintiff's hip was performed. (R:51-3)

Dr. Griscom noted that the only treating physician's opinions in the record were from Dr. Goldbetter, who believed that the plaintiff could sit or stand for four hours at a time, but could

10

not lift five pounds, and from Dr. Jacobsen, who listed all of the plaintiff's ailments and expressed his belief that she was disabled. Dr. Griscom pointed out that the plaintiff's sinusitis, which was treated with antibiotics, predated her chronic lymphatic leukemia and was not likely related to the leukemia. Dr. Griscom also stated that although the plaintiff's most serious medical problem was leukemia, that condition was stable and it did not appear that she had stopped working because of it. Therefore, the ALJ was required to evaluate the plaintiff's other medical issues in determining whether she was disabled. (R:53-4)

Dr. Griscom did not disagree with Dr. Goldbetter's opinion that the plaintiff could sit or stand/walk for four hours, but he did not understand the basis for the severe lifting, dexterity and postural limitations expressed by Dr. Goldbetter. Dr. Griscom twice observed that it would be helpful if he could review the plaintiff's other MRI studies, since all he had was the partial study focused on her hip. Dr. Griscom stated that the state agency physicians' opinions that the plaintiff could lift up to 20 pounds occasionally could be correct, as long as her back did not flare up. (R:55-9)

When questioned by the plaintiff's attorney, Dr. Griscom acknowledged that the plaintiff had continually complained of fatigue, but expressed his doubt that her fatigue was caused by the leukemia. Dr. Griscom conceded that if the plaintiff were required to rest three or four times per day, it would take her out of the work place entirely. (R:61-3)

Vocational expert (VE) Robert L. Lessne testified that the plaintiff's past job as a teacher's assistant was classified as light work, with an SVP of 3.  He stated that the plaintiff could perform that job and a myriad of others in the clerical field if she were able to do light work.  If the plaintiff were limited to sedentary work, she could perform the job of facilitator, which was sedentary with an SVP of 3, and registrar.  If the plaintiff could do only jobs that were sedentary and unskilled, she could perform the jobs of clerk and assembler, of which there were a substantial number of positions in the local, state and national economies.  If she were limited to unskilled light work, she could perform the job of parking attendant, of which there were many positions at the local, state and national levels.  (R:65-8)

The ALJ posed the following hypothetical to Mr. Lessne: assuming that the plaintiff could sit for 4 hours and stand/walk for 4 hours during an 8-hour work day, and could lift 20 pounds occasionally and 10 pounds frequently, were there jobs that she could perform?  Mr. Lessne responded that the plaintiff could then do light jobs with a sit/stand option, such as parking attendant and assembler, jobs which exist in significant numbers in the local, state and national economies.  The plaintiff could perform those jobs even if she could only occasionally bend, stoop, crouch, kneel or climb.  However, if the plaintiff required the ability to rest frequently and without restriction, there were no jobs she could perform.  (R:71-5)

At the conclusion of the hearing, counsel for the plaintiff requested the opportunity to obtain the plaintiff's MRI and X-ray reports, which the ALJ agreed would be helpful. The attorney also planned to contact Dr. Goldbetter to ascertain the basis for the restrictions he imposed on the plaintiff's lifting and grasping restrictions, as well as for her need for rest periods. The ALJ gave counsel two weeks to obtain the information. (R:87-8)

### III. DECISION OF THE ALJ

The ALJ first found that the plaintiff was insured, for Social Security disability purposes, through December 31, 2006; that she had not engaged in substantial gainful activity during the period from her onset date of June 2, 2005, through the date she was last insured; that as of that date, the plaintiff had severe impairments of chronic lymphatic leukemia, herniated lumbar disc and cervical disc disease, and that through the date she was last insured the plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R:16)

Next, the ALJ stated her finding that the plaintiff retained the residual functional capacity to perform the full range of sedentary work. The ALJ noted that when the plaintiff filed her application for benefits, she alleged that she was unable to work because of hip and neck pain and fatigue, indicating that she had felt tired 24 hours a day since June 2005. At the hearing, the plaintiff testified that she was unable to work because of fatigue, daily back and neck pain, unpredictable bouts of edema, chronic

13

sinusitis, sleep disturbance, severely swollen lips and allergic reactions to some medications, left hip pain, leukemia, nerve damage to one finger and swelling in her extremities.  The plaintiff also testified that she is depressed and that her husband and daughter took care of the housework.  She stopped working because she had been taking too much time off.  The plaintiff could not remain in one position for long, and lay on ice several times per day.  (R:17)

The ALJ found that the plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that the plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent that they were inconsistent with the ALJ's residual functional capacity assessment.  In making this determination, the ALJ considered the medical record, including the diagnosis of stage 0 chronic lymphatic leukemia, as well as the plaintiff's history of lumbar degenerative disease at L3 through S1 levels and advanced degenerative and hypertrophic spondolytic changes in the cervical area at the C5-6 and C6-7 levels (based on MRIs from January 1998).  (R:17-18)

The ALJ noted that the ME, Dr. Griscom, testified that the plaintiff's overall prognosis regarding her leukemia was quite good, and noted that the plaintiff had suffered from angioedema and a mild disc bulge spur at L5-S1.  However, Dr. Griscom could not explain the basis for Dr. Goldbetter's opinion that the plaintiff could not lift anything over 5 pounds and did not believe that the plaintiff's chronic sinusitis could keep her from working.  Dr. Griscom

14

generally agreed with the non-examining state agency physicians that the plaintiff could perform work at the light exertional level, but stated that the plaintiff might be more limited if her back were acting up.  (R:18)

The ALJ noted that Dr. Goldbetter's and Dr. Jacobsen's opinions that the plaintiff was totally and permanently disabled were issues reserved to the Commissioner, and were rendered years after the period under consideration.  Accordingly, the ALJ accorded little weight to the opinions of these physicians.   The ALJ emphasized that the plaintiff's hematologist, Dr. Richter, found that the plaintiff was asymptomatic except for fatigue, for which he recommended an exercise program.  (R:18-19)

The ALJ accorded great weight to Dr. Griscom's medical opinion based on Dr. Griscom's careful review of the medical evidence and his knowledge of the Social Security Administration's requirements,.  The ALJ found that through the date the plaintiff was last insured, she was unable to perform any of her past relevant work; she was 53 years old, closely approaching advanced age, on the date she was last insured; she had a high school education and was able to communicate in English, and had acquired work skills from her past relevant work which would transfer to the job of registrar. Considering the plaintiff's age, education, work experience and residual functional capacity, the plaintiff had acquired work skills that were transferable to other occupations with jobs existing in significant numbers in the national economy.  According to the VE, Mr. Lessne, the plaintiff could perform the job of registrar, and

15

that there were 1,100,000 of these jobs in the nation.   The ALJ
found that the VE's testimony was consistent with the information
contained in the Dictionary of Occupational Titles, and concluded
that the plaintiff was not under a disability during the relevant
time period. (R:19-20)

<u>IV. CROSS MOTIONS FOR SUMMARY JUDGMENT</u>

In her Motion for Summary Judgment (DE 14), the plaintiff
seeks reversal or remand on three grounds.  First, she argues that
the ALJ erred by failing to tender post-hearing MRI evidence to the
ME, while according great weight to the ME's opinion.  Next, the
plaintiff contends that the ALJ erred by rejecting the retrospective
opinion of Dr. Goldbetter, the plaintiff's treating physician, on
the primary basis that Dr. Goldbetter did not commence treating the
plaintiff until after the date on which she was last insured.
Finally, the plaintiff asserts that the ALJ failed to sustain her
burden of proof that there were other jobs that the plaintiff could
perform.  The plaintiff points out that the VE testified that the
plaintiff's skills were <u>not</u> transferable to the job of registrar,
and also stated that the plaintiff could not perform the full range
of sedentary work because she could not sit more than 4 hours in an
8-hour work day.  Additionally, the VE was not able to supply
information on the number of registrar jobs existing in the state
and local economies.

In his Cross Motion for Summary Judgment (DE 16), the
Commissioner argues that the ALJ's decision should be affirmed

because it was supported by substantial evidence and the correct legal standards were applied.

V. RECOMMENDATIONS OF LAW

At issue before the Court is whether the final decision of the Commissioner, as reflected by the record, is supported by substantial evidence. "Even if the evidence preponderates against the Secretary, we must affirm if the decision is supported by substantial evidence." <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1985). Substantial evidence is defined as such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389 (1971); <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233 (11th Cir. 1983). The Court must review the record as a whole to determine if the decision is supported by substantial evidence. <u>Bloodsworth</u>, 703 F.2d at 1239. The Court must also determine whether the Administrative Law Judge applied the proper legal standards. No presumption of validity attaches to the Commissioner's determination of the proper legal standards to be applied. <u>Richardson</u>, <u>supra</u>.

In making a disability determination, the ALJ must perform the sequential evaluation outlined in 20 CFR § 404.1520. First the claimant must not be engaged in substantial gainful activity after the date the disability began. Second the claimant must provide evidence of a severe impairment. Third, the claimant must show that the impairment meets or equals an impairment in Appendix 1 of the Regulations. If the claimant fails to provide sufficient evidence to accomplish step three, the analysis proceeds to step four. In

step four, the ALJ must determine the claimant's residual functional capacity, then determine if the claimant can perform his or her past relevant work.  The claimant has the burden of proving the inability to perform past relevant work. If the claimant's evidence shows an inability to perform past relevant work, the burden shifts to the ALJ in step five.  The ALJ must show that there is other gainful work in the national economy which the claimant can perform.  Once the ALJ identifies such work, the burden returns to the claimant to prove his or her inability to perform such work.

A. Weight Accorded to Physician's Opinions

The plaintiff contends that the ALJ erred by failing to supply the ME with the plaintiff's MRI reports from 1998 and 2008, especially in light of the fact that the ALJ accorded little weight to the opinions of the plaintiff's treating physicians, and great weight to the ME's opinion.  The Commissioner responds that the ALJ was under no obligation to re-contact the ME because the MRI evidence consisted of reports which already interpreted the raw imaging data.  According to the Commissioner, no useful purpose would be served by submitting this evidence to the ME, since the ME could only repeat what was contained in the reports: that the plaintiff suffered from degenerative disc disease.  The Commissioner asserts that the ALJ took this information into account by limiting the plaintiff to sedentary work.

The testimony of a treating physician must be given considerable weight unless "good cause" is shown to the contrary, and failure of the ALJ to clearly articulate the reasons for giving

18

lesser weight to the opinion of a treating physician constitutes reversible error. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986); 20 CFR §§ 404.157(d)(2), 416.927(d)(2)(1999). This Circuit has held that the requisite "good cause" exists where the treating physician's opinion is not supported by the evidence, where the evidence supported a contrary finding, or where the physician's opinion was conclusory or inconsistent with their own medical records. Lewis, 125 F.3d at 440; Jones v. Department of Health & Human Services, 941 F.2d 1529, 1532-3 (11th Cir. 1991); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991).

The fact that the physician did not examine the plaintiff until some time after the date on which the disability commenced does not render his or her opinion incompetent or irrelevant. Boyd v. Heckler, 704 F.2d 1207, 1211 (11th Cir. 1983). The Eleventh Circuit Court of Appeals has adopted the position of the Sixth and Seventh Circuits "that a treating physician's opinion is still entitled to significant weight notwithstanding that he did not treat the claimant until after the relevant determination date." Id., citing Dousewicz v. Harris, 646 F.2d 771, 774 (2d Cir. 1981); Stark v. Weinberger, 497 F.2d 1092, 1097 (7th Cir. 1974).

In Boyd, the treating physician examined the claimant in June 1997, eighteen months after the claimant's insured status expired and nearly five years after the date on which the physician stated the plaintiff became disabled. Nevertheless, the Eleventh Circuit held that the ALJ was required to consider the treating

19

physician's opinion, despite the fact that the claimant had not sought medical treatment for almost four years prior to the examination by the treating physician.  <u>Boyd</u>, 704 F.2d at 1210.

Moreover, as the plaintiff points out, the Eleventh Circuit repeatedly has held that the opinion of a reviewing, non-examining physician cannot constitute substantial evidence upon which to base an administrative decision. <u>Sharfarz v. Bowen</u>, 825 F.2d 278, 280(11th Cir. 1987); <u>Spencer on Behalf of Spencer v. Heckler</u>, 765 F.2d 1090 (11th Cir. 1985); <u>Strickland v. Harris</u>, 615 F.2d 1103 (5th Cir. 1980).  See also, <u>Swindle v. Sullivan</u>, 914 F.2d 222, 226 n.3 (11th Cir. 1990).

In the instant case, the ALJ did not make the finding of "good cause" required by <u>Lewis</u> before rejecting the opinions of the plaintiff's treating physicians, Dr. Goldbetter and Dr. Jacobsen. Instead, the ALJ relied on the opinion of Dr. Griscom, the ME, who did not examine or treat the plaintiff and who twice stated that he could not properly evaluate the plaintiff's back and neck pain based solely on an MRI taken of her hip.  (R:51-3, 57-8)   The Commissioner's argument, that the ALJ was not required to submit the MRI evidence to the ME because the ME would only reiterate the interpretations contained in the reports, is disingenuous.  The ALJ accorded great weight to the ME's opinion of the plaintiff's exertional limitations, despite the fact that ME stated that in order to form a correct opinion, it would be very helpful to see recent or even old MRI results. (R: 57)

20

Although the MRI reports do interpret images, they shed no light on whether the condition of the plaintiff's spine could produce the symptoms she alleges, or cause the limitations described by her treating physicians. This assessment must be made by a medical professional, since an ALJ "may not arrogate the power to act as both judge and physician." Carlisle v. Barnhart, 392 F.Supp. 2d 1287, 1294 (N.D. Ala. 2005).

Accordingly, the ALJ's findings on the plaintiff's credibility and on her residual functional capacity are not supported by substantial evidence, and the correct legal standards were not applied. The case must be remanded to afford the ME an opportunity to incorporate into his assessment of the plaintiff's capabilities the MRI results, and for the ALJ to apply the Lewis standard in deciding what weight to accord the opinions of the plaintiff's treating physicians.

B. Step Five of the Sequential Evaluation Process

The plaintiff also argues that the Commissioner did not meet his burden at Step 5 of the sequential evaluation process, of demonstrating that there were other jobs that the plaintiff could perform. The plaintiff correctly points out that the VE acknowledged that the skills required of a registrar were not the same as those of the plaintiff's past relevant work as a teacher's aid (R:82-84). Additionally, the undersigned notes that there was no discussion of whether the job of registrar had a sit/stand option, as required by the plaintiff's inability to sit or stand/walk for more than four hours during an 8-hour workday.

Finally, the plaintiff also is correct that the VE did not provide the number of registrar jobs which exist in the local and State economies.

These issues should be addressed on remand after the VE is given a hypothetical based on a medical opinion which incorporates the results of her MRI studies.

<u>VI. CONCLUSION</u>

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that the plaintiff's Motion for Summary Judgment (DE 14) be GRANTED, and that the matter be remanded for further hearing, at which the ALJ shall (1) recall the Dr. Griscom to permit him to consider the 1998 and 2008 MRI evidence, or call another ME to evaluate all the pertinent medical evidence; (2) reassess the weight to be accorded to the plaintiff's treating physicians in a manner consistent with <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1440 (11th Cir. 1997), and (3) present a hypothetical to the VE which incorporates any revised medical assessments and addresses the omissions discussed in Section IV B of this Report. It is further

RECOMMENDED that the Commissioner's Motion for Summary Judgment (DE 16) be DENIED.

The parties will have fourteen days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, for consideration by The Honorable William P. Dimitrouleas, United States District Judge.

22

Failure to file objections timely shall bar the parties from attacking on appeal factual findings contained herein.  LoConte v. Dugger, 847 F.2d 745 (11th Cir. 1988), cert. denied, 488 U.S. 958 (1988); RTC v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

DONE AND SUBMITTED at Fort Lauderdale, Florida, this  25th day of April, 2011.

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

All Counsel of Record